IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **GENUINE ENABLING TECHNOLOGY LLC,**<br><br>*Plaintiff*,<br><br>v.<br><br>**SONY CORPORATION et al.,**<br><br>*Defendants*. | Civil Action<br><br>No. 17-cv-135 |

<u>MEMORANDUM OPINION</u>

**GOLDBERG, J.**[1]                                                                                           **July 20, 2023**

In this patent infringement dispute, Plaintiff Genuine Enabling Technology LLC ("Genuine Enabling") asserts that video game hardware sold by Defendants Sony Corporation and Sony Interactive Entertainment LLC (collectively "Sony") infringes U.S. Patent No. 6,219,730 (the '730 patent).

On October 11, 2021, Sony moved to exclude certain opinions offered by Genuine Enabling's expert Dr. Kenneth Fernald under <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 113 (1993). I granted Sony's motion in part, precluding Dr. Fernald from offering the opinion that a component of Sony's products was structurally equivalent to an element of the claimed invention. Specifically, I found that Dr. Fernald had not sufficiently explained how that component operated in substantially the same "way" as the claimed structure under the function-way-result test. (<u>See</u> <u>Daubert</u> Opinion, ECF No. 303, at 6-15.)

---

[1] Pursuant to 28 U.S.C. § 292(b), I have been designated to serve as a visiting judge for the District of Delaware to handle this matter and other District of Delaware cases.

Presently before me is Genuine Enabling's "reargument" motion, which posits that my Daubert ruling misunderstood Dr. Fernald's opinions. In support, Genuine Enabling attached a declaration by Dr. Fernald clarifying which aspects of the claimed and accused structures he considers to be the "way" those structures operate under the function-way-result test. Finding that testimony from Dr. Fernald would be helpful to resolve this issue, I scheduled a hearing on June 20, 2023, wherein Dr. Fernald testified about his equivalency conclusions.

Having considered this testimony, along with Dr. Fernald's declaration, the parties' briefs on the original Daubert motion, and the motion for reargument, I conclude that Genuine Enabling's motion does not provide a basis to reconsider the reliability of Dr. Fernald's proposed testimony.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Dr. Fernald's Opinions and the Prior Daubert Motion

Genuine Enabling contends that certain video game controllers and consoles manufactured by Sony infringe claims of the '730 patent. A central infringement issue is whether the accused products contain a structure that meets the definition of a "framer" as used in the asserted claims. I construed the term "framer" as a means-plus-function term with a function of "[s]ynchronizing the user input stream with the input stream and encoding the user input stream and the input stream into a combined data stream" and a structure of "[t]he logic design at block 34 in Figure 4A and equivalents thereof." (Claim Construction Opinion, ECF No. 112, at 27.) Figure 4A of the '730 patent is a diagram showing various components and signals with an accompanying text describing how those components operate to synchronize the two data streams into a combined stream. ('730 patent at col. 5; Fernald Report ¶¶ 124-26.) The inventor described this approach to combining the two data streams as "unique and novel." (Claim Construction Opinion at 23.)

Through the report of its expert Dr. Kenneth Fernald, Genuine Enabling contends that the accused Sony products contain Bluetooth modules that are structurally equivalent to block 34 of Figure 4A under the "function-way-result" test, which requires that "the two [structures] perform the identical function in substantially the same way, with substantially the same result." Traxcell Tech. LLC v. Sprint Comms. Co., 15 F.4th 1121, 1128 (Fed. Cir. 2021).

Sony moved to exclude Dr. Fernald's opinion on structural equivalence for several reasons, and I granted Sony's motion as to just one, concluding that Dr. Fernald did not explain how the accused Bluetooth modules synchronized the two data streams in substantially the same "way" as block 34 of Figure 4A. (Daubert Opinion, ECF No. 303, at 6-15.)

**B.  Genuine Enabling's Motion for Reargument**

Genuine Enabling seeks to reargue Sony's Daubert motion as to Dr. Fernald's function-way-result opinion, and requests that Dr. Fernald be permitted to testify at trial as to his ultimate opinion that the accused Bluetooth modules are structurally equivalent to block 34 of Figure 4A. Genuine Enabling offers two bases for this request. First, it contends that I misunderstood Dr. Fernald's report when I concluded that Dr. Fernald did not analyze the "way" prong of the function-way-result test. In support, Genuine Enabling attached a new declaration from Dr. Fernald, which clarifies his opinion regarding the "way" block 34 of Figure 4A synchronizes the two data streams. Specifically, Dr. Fernald now expressly states that the "way" is by "synchronizing [the two data streams] to a common bit-rate clock." (Fernald Dec. ¶ 22.) Dr. Fernald extensively elaborated on this opinion at the June 20, 2023 hearing.

Dr. Fernald's declaration further states that details contained in his original report about how block 34 synchronizes streams to a common bit-rate clock (e.g., using a CODEC and a data selector) were not meant to be included in the "way" for purposes of the function-way-result test.

3

Instead, Dr. Fernald defines the "way" so that it stops at "synchronizing them to a common bit-rate clock" with no additional details. (Fernald Dec. ¶ 17.)[2]

Second, Genuine Enabling posits that Sony did not fully articulate the alleged problems with Dr. Fernald's report until its reply brief. In particular, Genuine Enabling submits, the section of Sony's brief addressed to Dr. Fernald's alleged failure to analyze the "way" prong did not quote from Dr. Fernald's report and instead relied on deposition testimony. Genuine Enabling therefore complains that it lacked an opportunity to fully respond to Sony's challenge.

Because Genuine Enabling had raised a concern that I misunderstood Dr. Fernald's report, and because Dr. Fernald's report concerns a highly technical subject, I determined that a hearing was appropriate to "allow for a meaningful evidentiary determination" of Sony's Daubert challenge. Oddi v. Ford Motor Co., 234 F.3d 136, 153 (3d Cir. 2000). That hearing was held on June 20, 2023.

### C. Dr. Fernald's Hearing Testimony

At the hearing, Dr. Fernald explained his opinions consistently with how those opinions were expressed in his report. Generally, it remains Dr. Fernald's opinion that because all Bluetooth

---

[2] To the extent Dr. Fernald's declaration could be considered a request to supplement his expert report, it would have to meet the factors set out in Meyers v. Pennypack Woods Home Ownership Assn., 559 F.2d 894 (3d Cir. 1977). See LabMD Inc. v. Boback, 47 F.4th 164, 189 (3d Cir. 2022). These factors are: (a) whether there was "bad faith on the part of the party seeking to call [the] witness[][,]" an "intent to mislead," or "willfulness" in failing to comply with the court's schedule; (b) the "ability of the party to have discovered" the relevant testimony early and the "validity of [its] excuse" for not doing so; (c) "the importance of the … testimony"; (d) "the prejudice or surprise" to the opposing party and its "ability … to cure [that] prejudice"; and (e) any "disrupt[ion] [to] the orderly and efficient trial of the case or of other cases in the court." Pennypack, 559 F.2d at 904-05. Dr. Fernald's declaration does not present new opinions of a technical or factual nature. Instead, Genuine Enabling stands by its prior explanation of how the accused devices function and seeks only to show that, legally, that explanation satisfies the "way" prong of the function-way-result test. Sony's response to that argument is likewise primarily legal and not factual. Thus, I conclude that an analysis under Pennypack is unnecessary.

devices require data to be synchronized to a bit-rate clock, the accused Bluetooth module must be equivalent to block 34 of Figure 4A. (N.T. 6/20/23 at 40:14-25, 42:25-43:3, 43:20-23, 46:2-5.) He testified that Bluetooth is the "standard" that the accused products use to communicate, and some parts of that standard—called "whitening" and "CRC generation"—must be supplied with data that is synchronized to a bit-rate clock. (N.T. 6/20/23 at 50:6-13.) Thus, according to Dr. Fernald, the accused Bluetooth module must produce data that is synchronized to a bit-rate clock, or "the product would fail." (N.T. 6/20/23 at 43:13; see also id. at 51:11-13 ("[W]e know that again from looking at [sic] what the logic would have to be doing in order to satisfy the Bluetooth specification.").)

Consistent with his original report, Dr. Fernald's testimony clarified that "whitening" and "CRC generation" are not themselves the steps that synchronize the two data streams. Rather, whitening and CRC generation are the parts of the Bluetooth module that need synchronized data, and the data streams therefore "must be synchronized" for whitening and CRC generation to function in the manner required by the Bluetooth specification. (See id. at 43:19-23; Fernald Report at ¶ 131 n.46.)

Although Dr. Fernald testified that the Bluetooth module must synchronize the two data streams to a common bit-rate clock, he did not testify to any processes, components, or other details inside the accused Bluetooth module to explain <u>how</u> the two data streams become synchronized to a common bit-rate clock.[3] When pressed on this point, Genuine Enabling's counsel explained that,

---

[3] While Dr. Fernald did inspect the accused Bluetooth module with a "Bluetooth protocol analyzer," his report and testimony make clear that the purpose of this inspection was to determine which optional features of the Bluetooth protocol were being used, and, consequently, whether "CRC generation" was being performed ("whitening" is mandatory). (Fernald's Report ¶ 129; N.T. 6/20/23 at 37:25-38:16, 39:17-40:13.) Genuine Enabling does not argue that this "protocol analyzer" allowed Dr. Fernald to uncover the process by which the Bluetooth module produced the synchronized data streams necessary for the "whitening" and "CRC generation" steps.

5

in Dr. Fernald's view, synchronizing to a common bit-rate clock <u>is in itself</u> the "how"—i.e. the "way." (N.T. 6/20/23 at 46:10-47:18.) Dr. Fernald testified consistently and stated:

> If I understood your question correctly, because we know whitening occurs with a specific circuit diagram showing in the Bluetooth specification, we know that not only are the two streams synchronized together, but they were necessarily synchronized, each of them was necessarily synchronized to the bit clock, which **is the way** the block 34 does it.
>
> You know, there's multiple ways of synchronizing two streams together. The specific way for both block 34 and the Bluetooth modules, the logic of the Bluetooth modules is they synchronize each of the two streams to the bit clock.

(N.T. 6/20/23 at 49:15-24 (emphasis added).) In short, at the hearing and in its briefing, Genuine Enabling has not added any more details to the "way" other than to continue to posit that the data streams are synchronized to a bit-rate clock in the accused Bluetooth module.

Dr. Fernald did not agree that his analysis established only "that … synchronization is occurring." Rather, he claimed it also showed that a bit-rate clock was involved and that each stream was synchronized to that bit-rate clock. (N.T. 6/20/23 at 44:3-24.) In Dr. Fernald's view, there are two types of synchronizing: synchronizing two streams to each other and synchronizing each stream to a common bit-rate clock:

> [T]o give you an analogy, … think about if you have two wrist watches. If I wanted to synchronize the two, the time of two wrist watches, I could look at one and set the time on the other to match it or I could look at a wall clock and set both wrist watches to the wall clock time.
>
> It's the latter analogy that best fits what's happening [in block 34 of Figure 4A]. Rather than trying to directly synchronize one stream to the other, what block 34 [does] is it synchronizes both streams to a common clock, which thereby forces the two streams to also [be] synchronized to each other, just like the wrist watch example.

6

(N.T. 6/20/23 at 29:9-20.) Thus, Dr. Fernald opined that not "all ways" of synchronizing data streams are equivalent, because there are at least two "ways" that are not equivalent: synchronizing to a bit-rate clock and synchronizing streams directly to each other. (N.T. 6/20/23 at 58:2-19.)[4]

### D.     Sony's Response

Sony maintains that Genuine Enabling's latest efforts are nothing new and still impermissible under Daubert and as a matter of patent law because it is incorrect to frame the "way" a device operates by isolating just one feature—the bit-rate clock—and ignoring the device's "overall structure[]." (Sony's Response at 4, citing Toro Co. v. Deere & Co., 355 F.3d 1313, 1324 (Fed. Cir. 2004).) Sony asks that I not alter my ruling barring Dr. Fernald from testifying to his ultimate opinion on structural equivalence.

## II.    LEGAL STANDARD

"Reargument under the District of Delaware's local rules attempts to balance the interests in obtaining a final decision on matters presented to the Court and the recognition that the Court, like all others, is capable of mistake and oversight. Well-grounded motions for reargument thus present the court with an opportunity to correct erroneous rulings." Morningred v. Delta Fam.-Care & Survivorship Plan, 790 F. Supp. 2d 177, 191 (D. Del. 2011) (footnotes and quotation marks omitted). Motions for reargument are granted "sparingly," and typically only when: (1) "the court has patently misunderstood a party"; (2) "the court has made a decision outside the adversarial issues presented to the court by the parties"; (3) "the court has made an error not of reasoning but

---

[4] Dr. Fernald also rejected Sony's accusation that his analysis of the Bluetooth module rested on a theory that all ways of achieving a given result are considered equivalent in electrical engineering. Rather, Dr. Fernald clarified that he only meant to say that logic circuits that perform a "specific function" in a "specific way" may be considered equivalent in the art even if they do not have "gates" (i.e., the building block of logic circuits) in common. (N.T. 6/20/23 at 53:4-20.)

of apprehension"; (4) there has been "an intervening change in the controlling law"; (5) there is "new evidence that was not available when the court issued its order"; or (6) there is a "need to correct a manifest injustice." Id. at 192.

"[A] motion for reargument may not be used by the losing litigant as a vehicle to supplement or enlarge the record provided to the Court and upon which the merits decision was made unless new factual matters not previously obtainable have been discovered since the issue was submitted to the Court … ." Schering Corp. v. Amgen, Inc., 25 F. Supp. 2d 293, 295 (D. Del. 1998) (quotation marks omitted, emphasis in original).

### III.  DISCUSSION

Genuine Enabling primarily argues that my prior Daubert opinion misunderstood the "way" Dr. Fernald had opined that the claimed structure (block 34 of Figure 4A) and accused structure (logic in the Bluetooth modules) synchronize data streams. Through his declaration and hearing testimony, Dr. Fernald has clarified that the "way" each device synchronizes data streams is by synchronizing those streams to a common bit-rate clock. Dr. Fernald has supplied no further details.[5] Genuine Enabling argues that even though Dr. Fernald has not described the specific processes or components that produce synchronized streams in the Bluetooth module, it is sufficient to demonstrate the "way" by explaining that data streams synchronized to a bit-rate clock must occur in order for the product to function correctly. Essentially, Genuine Enabling continues to press that Dr. Fernald be allowed to testify that the two structures in question are equivalent because they both function in that "way." It is worth noting, again, that Dr. Fernald has not opined

---

[5] As noted, Dr. Fernald's original report did supply additional details regarding how block 34 of Figure 4A synchronizes the two data streams, but he has since clarified that he does not consider those details to be part of the "way" (even if they are part of the "how").

on the steps or components within the Bluetooth module involved in producing such synchronized data streams, other than that a bit-rate clock is involved.

The relevant statutory section, 35 U.S.C. § 112(f), "operates to limit a claim from every possible means to those which are 'equivalent.'" Intel Corp. v. U.S. Int'l Trade Comm'n, 946 F.2d 821, 842 (Fed. Cir. 1991); see also Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc., 145 F.3d 1303, 1309 (Fed. Cir. 1998) ("[S]ection 112, paragraph 6, rules out the possibility that any and every means which performs the function specified in the claim literally satisfies that limitation." (emphasis in original)). "The word 'equivalent' in section 112 invokes the familiar concept of an insubstantial change which adds nothing of significance." Valmont Indus., Inc. v. Reinke Mfg. Co., 983 F.2d 1039, 1043 (Fed. Cir. 1993). "Structural equivalence under § 112, ¶ 6 is met only if the differences are insubstantial …; that is, if the assertedly equivalent structure performs the claimed function in substantially the same way to achieve substantially the same result as the corresponding structure described in the specification." Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259, 1267 (Fed. Cir. 1999).

By limiting the scope of a means-plus-function term to disclosed structures and their equivalents, § 112(f) "prevents an overly broad claim construction by requiring reference to the specification, and at the same time precludes an overly narrow construction that would restrict coverage solely to those means expressly disclosed in the specification." Symbol Techs., Inc. v. Opticon, Inc., 935 F.2d 1569, 1575 (Fed. Cir. 1991). A patentee does not obtain ownership of "every conceivable way or means to perform the [claimed] function"—just those ways that are substantially the same as the way the patentee invented and disclosed. Mas-Hamilton Grp. v. LaGard, Inc., 156 F.3d 1206, 1214 (Fed. Cir. 1998). But by the same token, the patentee is not limited to structures

9

that replicate every detail disclosed in the specification—so long as the insubstantiality test is met. Odetics, 185 F.3d at 1267.

A patentee and accused infringer will sometimes disagree as to how specifically or generally to phrase the "way" a disclosed structure operates. 5B Chisum on Patents § 18.04b (2022). As an analogy, consider how the "way" a paperclip holds paper together could be phrased with more detail ("by using bent metal to apply pressure to pages") or less ("by applying pressure to pages"). Depending on the level of specificity, a paperclip and a paperweight may or may not hold papers together in the same "way." In deciding how much detail is required, "[t]he appropriate degree of specificity is provided by the statute itself; the relevant structure is that which 'corresponds' to the claimed function. … Further deconstruction or parsing is incorrect." Odetics, 185 F.3d at 1268.

"Generally, a number of factors may be considered when determining the scope of a means-plus-function limitation, including the language of the claim, the patent specification, the prosecution history of the patent, other claims in the patent, and expert testimony." In re Hayes Microcomputer Prod., Inc. Pat. Litig., 982 F.2d 1527, 1543 (Fed. Cir. 1992) (quotation marks omitted). For example, an "'indispensable' part of" a structure may be given "greater weight" in determining whether two structures are equivalent. Toro Co. v. Deere & Co., 355 F.3d 1313, 1324 (Fed. Cir. 2004). But each "individual component[]" of a structure is not in itself a "claim limitation[]" required to be present (literally or as an equivalent) in the accused device. Odetics, 185 F.3d at 1268. "Rather, the claim limitation is the overall structure corresponding to the claimed function." Id.

Here, the dispute between the parties revolves around how specifically or generally Genuine Enabling's expert may describe the "way" the claimed and accused structures synchronize the two data streams. Genuine Enabling asserts that synchronizing two streams to a bit-rate clock is, in itself, the "way" block 34 of Figure 4A functions. That is, Genuine Enabling proposes to omit

10

details described in the specification (such as the data selector and CODEC) from the "way," even though Dr. Fernald agrees that those details are part of the process by which block 34 causes the two streams to become synchronized. (Fernald Dec. ¶ 9.)[6] Phrasing the "way" solely in terms of the bit-rate clock potentially allows Genuine Enabling to show that the accused Bluetooth module is equivalent to block 34 even though the specific processes used to synchronize data streams in the Bluetooth module are left undescribed by Dr. Fernald and he has not discussed how the Bluetooth module's structure resembles (or differs from) the claimed structure. But Dr. Fernald's report does not discuss why it is appropriate to omit details that are concededly part of how block 34 of Figure 4A causes the two data streams to become synchronized. And Dr. Fernald has not explained why these details are "insubstantial." See Odetics, 185 F.3d at 1267. This deficiency is even more pronounced on the Bluetooth module side, as it is unknown what other details are even involved in the process of synchronization and thus whether the omitted details are "insubstantial change[s] which add[] nothing of significance." Valmont Indus., 983 F.2d at 1043.

The second problem with phrasing the "way" so broadly is that the law requires the "degree of specificity" of a means-plus-function claim limitation to be "the … structure [that] 'corresponds' to the claimed function." Odetics, 185 F.3d at 1268. The '730 patent describes the structure corresponding to the "framer" limitation with a certain degree of specificity. While that description does not include every possible detail (e.g., some of the components are depicted as "box[es]" even though they are made from smaller parts, N.T. 6/20/23 at 27:18-24), it does include at least a

---

[6] As Genuine Enabling points out, the CODEC is outside the dotted-line border of block 34 and therefore not part of the "framer" limitation as construed. But Dr. Fernald's report makes clear that part of how block 34 causes the two streams to become synchronized is by using the same bit-rate clock for the CODEC as for the data selector. (Fernald Report ¶ 126 n.39; Fernald Dec. ¶ 9; N.T. 6/20/23 at 27:14-15 ("[S]ome of the logic of the codec does play a role in the synchronization process … .").)

data selector that alternately selects between two streams to synchronize them. (Fernald Report ¶¶ 125-26.) Genuine Enabling remains free to claim as equivalents structures that omit such details—and thus that operate in different "ways"—by showing that the differences are insubstantial. Valmont Indus., 983 F.2d at 1043. But Genuine Enabling needs a basis for doing so. Showing only that block 34 and the Bluetooth module have one detail in common—a bit-rate clock—fails to shed light on why that detail is the most significant or why other details are of lesser importance.[7]

Toro Co. v. Deere & Co., 355 F.3d 1313 (Fed. Cir. 2004), is instructive in resolving this issue. That case involved a means-plus-function term ("control means") with a structure that "include[d] a mechanical cam system." Id. at 1323. The accused product used a solenoid system, making the issue for infringement whether the cam and solenoid "function[ed] identically and in a substantially similar structural way to achieve the substantially same result." Id. The patentee's expert testimony demonstrated that the cam and solenoid systems were interchangeable, but this

---

[7] Compare, for example, Dr. Fernald's analysis of a different claimed function (producing the "output stream") to show that one of its components (an "inverting logic gate") was an insubstantial difference from the accused product:

> A POSITA [person of ordinary skill in the art] would not consider a simple inverting logic gate, as in the highlighted path above in Figure 4A, as a substantial structural difference. This inverter is used in that embodiment to correct for the signal inversion of the TXD line that occurs in block 35. However, as I discuss in ¶ 114 of this report, the '730 patent describes a number of different communication links and hence associated transceivers. A POSITA would clearly understand that if using different transmitter/receiver circuitry in place of block 35, such an inverter may or may not be needed.

(Fernald Report ¶ 140.) This analysis is less conclusory than that offered for the "synchronizing" function, which essentially asserts, without explanation, that the common feature of a bit-rate clock shows equivalence. While Genuine Enabling cites cases in which expert testimony on equivalence was found sufficient despite accusations that it was "conclusory," the cited opinions do not endorse those accusations or hold that conclusory expert testimony is admissible. See Applied Medical Res. Corp. v. U.S. Surgical Corp., 448 F.3d 1324, 1335 (Fed. Cir. 2006) ("[W]e conclude that the declaration was not overly conclusory … ." (emphasis added)); Charles Mach. Works, Inc. v. Vermeer Mfg. Co., 723 F.3d 1376, 1380 (Fed. Cir. 2013) (describing the expert's detailed reasoning on equivalence).

showed only their "function or result," not "the way in which cam systems and solenoid systems actually work." Id. at 1324. Absent evidence that the two systems functioned in substantially the same way, summary judgment was found to be properly granted on noninfringement. Id. at 1314.

This result is consistent with In re Hayes Microcomputer Prod., Inc. Pat. Litig., 982 F.2d 1527 (Fed. Cir. 1992). Hayes also involved a means-plus-function claim limitation, but the specification described the corresponding structure as a microprocessor programmed to perform certain "desired functions" without specifying how this programming was to be accomplished, relying instead on the fact that "[o]ne skilled in the art would know how to program a microprocessor to perform the necessary steps described in the specification." Id. at 1533-34 (emphasis deleted). The patentee's evidence demonstrated that the accused product contained a microprocessor and that it had been programmed in the specified manner, including testimony from the designer about the steps he designed the product to perform. Id. at 1541-42. The Federal Circuit concluded that the patentee's evidence was sufficient to prove infringement. Id. at 1543.

Thus, Hayes shows that where the patent's specification itself describes a structure in terms of the steps it has been programmed to perform, evidence that an accused product has been programmed to perform those same steps will suffice. See id. at 1543 (noting that "the patent specification," among other factors, may be considered in "determining the scope of a means-plus-function limitation"); Odetics, 185 F.3d at 1268. ("[T]he relevant structure is that which 'corresponds' to the claimed function."). Hayes does not stand for the broader proposition that evidence regarding how a device behaves is always sufficient to establish that structures operate in the same way, regardless of how the structure is described in the specification.

Here, in contrast to Hayes, the specification of the '730 patent does not describe the framer merely as any logic circuit designed to synchronize two data streams to a bit-rate clock. Rather, it

13

is described as a logic circuit that synchronizes data streams in a particular manner, using particular processes and components. Dr. Fernald notes these processes in paragraphs 125 and 126 of his report. While it might have been possible to describe block 34 as "just a box" having "certain features," (N.T. 6/20/23 at 27:18-24,) the patentee did not do so. Thus, any analysis of the accused product under the function-way-result test must describe and determine whether the "way" the accused product synchronizes data streams differs substantially from the disclosed "way."

Given all of the above, I conclude that Genuine Enabling has not provided a basis to reconsider my Daubert ruling. Dr. Fernald's analysis shows only that the Bluetooth module must achieve a certain result—data streams synchronized to a common bit-rate clock—to satisfy other requirements of the system, and does not show how, i.e. the "way," that result is achieved. Genuine Enabling's patent did not grant it ownership of "every conceivable way" of meeting the requirements of the Bluetooth specification. Mas-Hamilton, 156 F.3d at 1214. Absent a demonstration of how the Bluetooth module achieves data streams synchronized to a common bit-rate clock, a conclusion that the claimed and accused structures function in substantially the same way cannot reliably follow.

Genuine Enabling attempts to compensate for Dr. Fernald's lack of detail by pointing to sections in his report demonstrating that logic circuits built using different components (called "gates") can perform the same "operation." (Fernald Report ¶¶ 55-64.) In Dr. Fernald's view, such circuits should be considered "equivalent." (Id. ¶ 56.) Dr. Fernald repeats the phrase "same operation" in reference to block 34 of Figure 4A and the accused Bluetooth module, and concludes from this fact that the two structures are equivalent. (Id. ¶ 135.) To the extent Genuine Enabling is arguing that all logic circuits that can be used interchangeably are equivalent, this would be inconsistent with the function-way-result test, as interchangeability "goes to the function or result of

these systems, and begs the issue of the way in which … [those] systems actually work." Toro, 355 F.3d at 1324. "Almost by definition, two structures that perform the same function may be substituted for one another." Chiuminatta, 145 F.3d at 1309-10. "Such evidence does not obviate the statutory mandate to compare the accused structure to the corresponding structure." Id. (See also N.T. 6/20/23 at 59:17-22 ("Once you identify a specific way that something is being accomplished, … the various logic designs that could implement that specific way are considered equivalent … ." (emphasis added)).)

Finally, Genuine Enabling argues that my prior Daubert ruling inappropriately required Dr. Fernald to identify specific components (a CODEC and data selector) in the accused Bluetooth modules. But my prior ruling only suggested that identifying equivalents to a CODEC and a data selector was an "example" of one method by which Dr. Fernald might have established that the Bluetooth controllers synchronize data streams to a bit-rate clock in a similar "way" to block 34 of Figure 4A. (Daubert Opinion, ECF No. 303, at 13.) Other methods of analysis might have been possible, but other methods also do not appear in Dr. Fernald's report.

For these reasons, I conclude that Genuine Enabling has not demonstrated a sufficient ground for reconsidering my prior ruling that Dr. Fernald lacks a reliable basis to offer the ultimate opinion that the claimed and accused structures are equivalent.[8]

---

[8] Genuine Enabling also complains that Sony failed to adequately set out its Daubert position until its reply. Because Genuine Enabling has had several opportunities to clarify its position and respond to Sony's arguments (namely, at oral argument on the original Daubert motion, in its motion for reargument brief, in Dr. Fernald's new declaration, and at the hearing on its motion for reargument), Genuine Enabling's criticism is unhelpful. Moreover, Sony's opening brief was sufficient to put Genuine Enabling on notice of the nature of the challenge and did not lead to unfair surprise.

IV. **CONCLUSION**

For the reasons set out above, Genuine Enabling's motion for reargument will be denied.[9]

An appropriate order follows.

---

[9] Some of the parties' arguments on the adequacy of Dr. Fernald's equivalency analysis are directed to the sufficiency of evidence rather than the reliability of expert testimony. (Compare Sony's Response at 5 ("Because the Court relied on Dr. Fernald's own factual contentions regarding both how the logic design at block 34 and how the Accused Bluetooth module allegedly synchronize the streams to a bit-rate clock, and then concluded as a matter of law his opinions were insufficient, there is no genuine dispute of material fact."), with Fed R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact … .").) In general, sufficiency-of-the-evidence questions should not be answered by viewing an expert's report in isolation but require a more fulsome record such as that available on a motion for summary judgment. See Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1069-70 (3d Cir. 1990). Nothing in this opinion precludes Genuine Enabling from offering additional evidence at summary judgment or trial that the accused and claimed structures are equivalent. In addition, I have not excluded any of Dr. Fernald's testimony of a technical or factual nature about how the claimed and accused structures operate or his opinions about how equivalence is viewed in the art.